# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DARRELL COLEMAN, | § | |
| | § | No. 120, 2015 |
| Defendant Below- | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | |
| STATE OF DELAWARE, | § | ID No. 1305011774A |
| | § | |
| Plaintiff Below- | § | |
| Appellee. | § | |

Submitted: May 4, 2016
Decided: June 3, 2016

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en banc*.

## ORDER

On this 3rd day of June 2016, it appears to the Court that:

(1) Defendant-Below/Appellant Darrell Coleman was convicted by a Superior Court jury of Murder in the First Degree[1] and Possession of a Firearm During the Commission of a Felony.[2] In this appeal, he contends that the trial court committed error when it admitted into evidence an out-of-court statement given by the victim's six-year-old son ("J.R."). Specifically, he contends that the State failed to lay a proper foundation for the admission of the out-of-court statement under 11 *Del. C.*

---

[1] 11 *Del. C.* § 636.

[2] 11 *Del. C.* § 1447.

§ 3507. For the reasons set forth below, we find it unnecessary to address the issue raised by Coleman because we have concluded that any error, if there was error, is harmless beyond a reasonable doubt in view of the other evidence supporting his conviction. Therefore, Coleman's conviction is affirmed.

(2) The events leading up to the offenses are as follows. As part of a planned visitation, J.R. spent May 12, 2013 with his father, Marvin Moore, at Moore's residence at Riverside in Wilmington. Moore was expected to return J.R. to his mother that evening. In the hours leading up to the time Moore was to do so, he and Coleman, who was then the boyfriend of J.R.'s mother, exchanged numerous phone calls. Finally, they arranged for Moore to drop J.R. off at a Wawa near Memorial Drive in New Castle. Moore drove toward the Wawa with J.R. and two of Moore's friends, Tierra Battles and Dearius Riley, stopping first at the home of another friend near the Wawa. As they approached the friend's home, Moore could be heard on the phone angrily telling a male voice on the other end that he was not going to let him pick up his son. After they arrived at the friend's home, they decided that Battles and Riley would take J.R. over to the Wawa while Moore remained at the friend's house.

(3) When Battles and Riley arrived at the Wawa with J.R., Coleman was there. Battles asked Coleman where J.R.'s mother was, and Coleman asked Battles where Moore was. They then began arguing. J.R. got in Coleman's vehicle, and Coleman

2

followed Battles back to her vehicle to continue arguing. At one point, Coleman said: "Tell Marvin next time Marvin say something crazy out his mouth I be at his front door."[3] Riley asked if Coleman wanted him to go get Moore, and Coleman replied: "No. If Marvin was a man, Marvin would have come down."[4] Coleman then departed the Wawa with J.R. while Battles and Riley returned to the friend's house.

(4) When told about the confrontation, Moore responded: "'I'm sorry, but I got to go take care of my business,' and he was going to go meet [Coleman] to fight."[5] Moore, Battles, and Riley then drove back to Riverside, during which time Moore and Coleman were "snapping over the phone" in a "heated" conversation. Finally, Moore and Coleman arranged to meet near Peralta's Market in Riverside, which was about a block and a half away from Moore's residence. When Coleman arrived, he backed his vehicle down a one-way street and parked near Peralta's Market. While traveling back to Riverside, Riley overheard Moore say on the phone: "You already at the corner store, so I'll be there in a little bit."[6]

(5) After Moore, Battles, and Riley arrived back at Moore's house, Moore walked to the sidewalk across the street from Peralta's Market. Coleman then got out of his vehicle and ran diagonally back across the street between two cars. Moore was

---

[3] Appellee's Ans. Br. App. at B13.
[4] *Id.*
[5] *Id.* at B31.
[6] Appellant's Op. Br. App. at A66-67.

3

then shot. Coleman ran back to his car and took off. When police arrived at the scene, they determined that Moore had one gunshot wound to the jaw and another one to his chest. He also had an unfired revolver between his thighs.

(6) Michelle Pflaumer, from the Children's Advocacy Center, interviewed J.R. on May 13, 2013. J.R. discussed the previous day's activities during his visitation with his father. He discussed being driven to a gas station by Battles and Riley and being picked up by Coleman. Initially, J.R. told Pflaumer that Coleman took him to his mother's home to sleep, but J.R. eventually said that Coleman took him to the vicinity of his father's home in Riverside. He said that while seated in Coleman's vehicle, he saw Coleman shoot his father.

(7) The Wilmington Police were unable to locate Coleman in Delaware. As a result, they enlisted the help of the U.S. Marshals Service, which apprehended Coleman in Newark, New Jersey on May 31, 2013. In October of the same year, Coleman was indicted by a grand jury on charges of Murder in the First Degree, Possession of a Firearm During the Commission of a Felony, and Possession of a Firearm by a Person Prohibited.[7]

(8) Trial commenced on October 20, 2014 and lasted five days. J.R. was called as a witness by the State. On direct examination, he discussed some events of

---

[7] This charge was severed and not subject to this appeal.

4

the day and evening of the murder, but did not mention, and was not directly asked, about seeing the shooting itself. At the conclusion of his direct examination, the State moved for the admission of his prior out-of-court statement under § 3507. Coleman objected on the grounds that the State had not laid an adequate foundation because J.R.'s testimony did not touch on the shooting. The trial court overruled the objection, and the statement was played for the jury.

(9) In the first of our cases to discuss what was then newly enacted § 3507, *Keys v. State*, we established the foundational requirement that in order for the statement to be admitted, the direct examination of the witness at trial "should touch both on the events perceived and the out-of-court statement itself."[8] Coleman contends that this requirement was not satisfied because J.R.'s direct examination did not touch on the shooting. Coleman argues that this error violated his Sixth Amendment right to confront witnesses testifying against him. Further, Coleman argues that this error cannot be harmless because it was the only evidence connecting him to the crime.

(10) We do not resolve Coleman's § 3507 argument because we have concluded that the other evidence of Coleman's guilt is so overwhelming that any error in the admission of J.R.'s out-of-court statement, if any, was harmless beyond

---

[8] *Keys v. State*, 337 A.2d 18, 23 (Del. 1975).

5

a reasonable doubt. This evidence included testimony from both Battles and Riley regarding the heated exchanges between Coleman and Moore, which ultimately led to the arranged rendezvous at Peralta's Market. A Riverside resident testified that after she heard gunshots, she saw a man with dreadlocks run to a dark colored sedan that sped away from the area. A police officer also testified regarding the inability to locate Coleman within Delaware and his ultimate apprehension in Newark, New Jersey. Another police officer testified that the murder weapon, which was also admitted as evidence, was found two days after the murder on the northbound catwalk (toward New Jersey) of the Delaware Memorial Bridge.

(11) The State also introduced physical evidence. This included surveillance video of: (1) Battles and Riley handing J.R. over to Coleman at the Wawa; (2) Coleman arriving at Peralta's Market; and (3) Coleman starting to leave Peralta's Market, stopping, running over to where Moore's body was later found, and running back to his car before fleeing. Additionally, the State introduced phone records that documented twenty calls between Coleman and Moore before the murder. Those records also showed that Coleman stopped calling Moore and turned his phone off after the shooting. Further, the State produced cell phone tower maps that tracked Coleman's movement to Wawa and then to Peralta's Market. The State also admitted Coleman's mug shot showing that at the time of his arrest he still had dreadlocks like

6

the man seen running from the shooting and in the surveillance videos. This evidence not only corroborated J.R.'s statement but also corroborated the live testimony.

(12) Contrary to Coleman's assertion that the State's case was based solely on J.R.'s statement, it was merely a portion of the evidence presented during Coleman's five day trial. Any error in the admission of J.R.'s statement, if any, was harmless beyond a reasonable doubt based on the record before us.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is **AFFIRMED.**

BY THE COURT:

_____
Justice

7